UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Industrial Tower
and Wireless, LLC

     v.                                    Civil No. 08-cv-122-JL
                                              Opinion No. 2009 DNH 121
Town of Epping and
Jane Burley


**O R D E R**

Industrial Tower and Wireless has sued the Town of Epping,
claiming that its planning board's decision denying Industrial a
conditional use permit for a wireless telecommunications tower in
the Town violates § 704(a) of the Telecommunications Act of 1996
because the decision is not "supported by substantial evidence
contained in a written record."  47 U.S.C. § 332(a)(7)(B)(iii).
This court has jurisdiction over this claim under 28 U.S.C. §
1331 (federal question).

Industrial moves for summary judgment on this claim.[1]  The
Town and Jane Burley––whose property abuts the proposed tower
site and who was therefore allowed to intervene as a defendant in

———————————————

[1]Industrial also claims that the decision prohibits or has
"the effect of prohibiting the provision of personal wireless
services," 47 U.S.C. § 332(a)(7)(B)(i)(II), also in violation of
the Act, and seeks judicial review of the planning board's
decision, as authorized by New Hampshire law, N.H. Rev. Stat.
Ann. § 677:15.  Industrial has not moved for summary judgment on
either of these claims.

this matter, see Fed. R. Civ. P. 24(a)(2)--object.  After oral argument, Industrial's motion is denied because, as explained fully infra, substantial evidence supports the board's decision that the existing state police tower in the Town is a "feasible" alternative to Industrial's proposed site, either alone or in conjunction with a shorter tower at Industrial's proposed site. Furthermore, in light of this ruling, Industrial is ordered to show cause why summary judgment should not enter against it on its substantial evidence claim.

I.  **Background**

Industrial applied to the Epping Planning Board for a conditional use permit for a 150-foot wireless communications monopole tower to be located on an otherwise unimproved, heavily forested parcel at 103 High Road in the Town.  Industrial's application cited gaps in cellular coverage along stretches of Routes 125, 152, and 155.  Route 125 runs roughly north-south through the center of Epping, from its southern border with Brentwood to its northern border with Lee.  About one half-mile before the Lee town line, Route 155 branches off of Route 125, and both roads continue to run northward into Lee, where, within about one mile, each intersects with Route 152.  Route 152 runs roughly east-west through Lee, never entering Epping.  The

2

proposed tower site sits just west of the intersection between Routes 125 and 155, just south of the Lee town line.

The site also sits in the rural residential zone on Epping's zoning map.  Under the Town's "Personal Wireless Services Facilities Ordinance," Article 20 of its zoning by-laws (the "Ordinance"), "[g]round-mounted personal wireless services facilities" (like Industrial's proposed tower) in this zone are limited in height to "ten feet above the average tree canopy height, measured from average ground level."  Because Industrial's proposed tower would have exceeded this height limitation by between 80 and 90 feet,[2] Industrial sought a variance from the Town's Zoning Board of Adjustment, which was granted, and later upheld against a challenge by Burley in the state superior court.

The Ordinance also provides that "[a] personal wireless service facility shall require a conditional use permit in all cases."  So, to proceed with the tower, Industrial sought such a permit from the Town's planning board.[3]  The Ordinance sets forth

---

[2]This limitation applies where there are no buildings within 300 feet, which is the case at the proposed site.

[3]While stopping short of arguing that the variance eliminated any need for a conditional use permit, Industrial has argued that, since the variance relieved it from complying with the height requirement, the planning board could not require Industrial to consider a lower tower as a condition of the

a number of standards which "must be met and/or impacts mitigated to the satisfaction of the Planning Board prior to the granting of a Conditional Use Permit."  The Ordinance groups these standards into a number of categories, including "Location" and "Co-location."  The Ordinance also explains that it was "enacted in order to effectuate the following goals and standards," including to "[r]educe adverse impacts [personal wireless service] facilities shall create, including but not limited to; impacts on aesthetics," and to "[r]equire the configuration of [personal wireless service facilities] in such a way that minimizes the visual impact."

In relevant part, the "Location" standards, set forth in section VI(b), provide that:

> 1) If feasible, personal wireless service facilities shall be located on existing structures, including but not limited to . . . existing telecommunications facilities, utility poles and towers, and related facilities, provided that such installation preserves the character and integrity of those structures . . . . The applicant shall have the burden of proving that there are no feasible existing structures upon which to locate.

As set forth in section VI(c), the "Co-location" standards provide, also in relevant part:

> 1) Licensed carriers shall share personal wireless services facilities and sites where feasible and

---

permit.  <u>See</u> <u>infra</u> note 12.

appropriate, thereby reducing the number of personal
wireless facilities that are stand-alone facilities.

2) In the event that co-location is found to be not
feasible, a written statement of the reason for the
infeasibility shall be submitted to the Town.

During the public hearings before the planning board on

Industrial's application, it was suggested that, rather than

constructing the single proposed 150-foot tower at 103 High Road,

Industrial could proceed with a shorter tower at that site in

connection with another shorter tower at a different site,

potentially the existing communications tower at the state police

barracks in the Town or other locations along Route 125.  The

state police tower is located roughly 2.2 miles to the southeast

of the proposed 103 High Road site and sits in the Town's

wireless overlay zone (coterminus with the Town's highway

commercial and industrial commercial zones), where the Ordinance

permits personal wireless facilities up to 150 feet high.

Industrial's application had stated that the existing state

police tower was not a feasible location under §§ IV(b)(1) and

IV(c) of the Ordinance because it "is approximately four miles

from the [103 High Road] site and does not meet the [radio

frequency] requirements needed to remedy the existing coverage

gap."  Industrial also included a map projecting the coverage

from the state police tower, which would not reach the

intersection of Routes 125 and 155 in northern Epping--falling
roughly 1.1 miles short of that point--nor any part of Route 152
as it passes through Lee.  Coverage from the state police tower
would, however, blanket an area in roughly the geographical
center of Epping, including the intersection of Route 125 and
Route 27, which runs east-west through the Town.  That
intersection also lacks sufficient wireless coverage, as shown by
Industrial's own submissions.

The board subsequently received a report from David Maxson,
a "municipal wireless consultant" retained by Burley.  Maxson
explained that his business, Broadcast Signal Lab, has
"provide[d] assistance to well over one hundred municipalities in
all manner of wireless facility siting activities, including
permit application review . . . and expert testimony in federal
court on wireless matters."  In relevant part, Maxson's report
disagreed with Industrial's view that the state police tower was
not a feasible location, pointing out that it "is a little over
two miles from the proposed [103 High Road] site, not four.  This
is close enough to suggest it could exert substantial influence
on a large portion of Route 125 coverage in Epping," based
Industrial's own propagation study.  Thus, Maxson concluded,
"[w]hile the State Police Tower does not directly substitute for

the coverage of the proposed tower . . . it would provide enough coverage in Epping to eliminate the need for the proposed tower."

Maxson also concluded that "the combination of the State Police Tower, the existing American Tower facility [located in southern Epping] and a hypothetical 80-foot pole in the north of Epping would provide significantly better coverage in Epping than the proposed tower."  In support of this conclusion, Maxson submitted a propagation map showing the coverage from those existing facilities combined with that from an 80-foot pole at a particular location in northern Epping near the 103 High Road site.  Maxson further noted, as another alternative, that "the use of a tall tower in the Wireless Overlay District could contribute significantly to improved . . . coverage along Route 125 in Epping."

Industrial provided the planning board with a response to Maxson's report, stating, in relevant part:

> The State Police tower has been the subject of much debate at several of the [planning board] meetings. The plain and simple truth is that the State Police tower will not provide a sufficient signal to fill in the coverage gap within the town of Epping.  Additional reasons why the site will not work are provided in the attached Tower Consultants, Inc. (TCI) letter.  TCI brings decades of knowledge and experience in the tower industry and specialize [*sic*] in tower structure analysis.  The letter states that the tower will not be adequate structurally to support additional load capacity of multiple carriers' antenna equipment.

7

The attached letter from TCI states, "Per the limited information provided to [Industrial] on" the "120 foot Guyed Tower" at the state police barracks, which "exclud[ed] any usable information on the foundations, it is our opinion that the tower will not be adequate, structurally to support up to five (5) wireless carriers" under the applicable design standard.

Though, based on counsel's representations at oral argument, there were five wireless carriers in business at this time, no more than two had ever expressed interest in locating on Industrial's proposed tower.  And Industrial had described the state police tower as 150 feet tall––not 120 feet tall––in the propagation study submitted with its application.  Maxson later told the board that, while TCI had analyzed the tower as 120 feet tall and just 18 inches across, it actually measures 160 feet tall and 3 feet across.

Explaining that it had "solicited information from various sources to determine whether other companies have been successful at collocating on State Police facilities," Industrial also submitted a letter from a principal at KJK Wireless, a business with ten years' experience developing wireless towers in New Hampshire.  The author stated that, in his experience, "collocation on New Hampshire Public Safety telecommunications facilities is not allowed," due to "the potential compromise to

public safety and national security communications" and that he was "not aware of any wireless carriers being collocated on public safety towers in New Hampshire."

Maxson and Burley, though, provided the board with information to the contrary.  Maxson said it was "false" that state police towers "are not available to the private sector." Burley reported that the head of the state police had told her "that he would be willing to entertain wireless on his tower and referred her to the communications director who explained an engineering study would have to be done and offered to help in any way her [*sic*] could for other carriers to be on their tower."

Industrial's response also questioned Maxson's suggestions for locating a tower elsewhere.  Industrial explained that the sites identified in Maxson's report were inappropriate for a variety of reasons:  they are "too far south of the coverage gap," or would result in "an excessive and impractical amount of coverage overlap" with other existing wireless facilities, or have wetlands or other geographical features requiring variances, obstructing access, or both.  Industrial also pointed out that it had considered more than eighty different parcels in the Town as part of "an exhaustive search for viable locations."

In its written decision denying a conditional use permit for the proposed tower, the board found that Industrial's application

did not meet certain standards set forth in the Ordinance.
Specifically, the board found that, in violation of § VI(b)(1),
Industrial "failed to explore a new tower with multiple
collocations at the State Police Barracks" and, relatedly, in
violation of §§ VI(c)(1) and (2), Industrial "failed to consider
alternative heights, alternative and innovative siting
techniques, and collocation options on existing structures."[4]
The board also found that "the applicant failed to address the
option of a lower height to the tower to minimize impacts as
detailed in the ordinance," reasoning that "a lower tower was a
reasonable alternative" if "developed in conjunction with another
site," such as the police tower.

## II.  Applicable legal standard

Under the TCA, "[a]ny decision by a . . . local government
or instrumentality thereof to deny a request to place, construct,
or modify personal wireless service facilities shall be in
writing and supported by substantial evidence contained in a
written record."  47 U.S.C. § 332(c)(7)(B)(iii).  This provision

---

[4]The board also found that, in violation of § IV(b)(4),
Industrial "failed to present options for camouflaging the
structure with use of flush mounts, internal mounts, or other
methods."  Because neither the Town nor Burley relies on this
finding in defending the board's decision, however, the court
need not consider it.

"does not create a substantive federal limitation upon local land use regulatory power," Sw. Bell. Mobile Sys., Inc. v. Todd, 244 F.3d 51, 58 (1st Cir. 2001), but "is a procedural safeguard which is centrally directed at whether the local zoning authority's decision is consistent with the applicable zoning requirements." ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002) (quotation marks omitted).

The court of appeals has instructed that the TCA's substantial evidence standard, though "highly deferential, is not a rubber stamp." Todd, 244 F.3d at 58–59; see also Town of Amherst v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 16 (1st Cir. 1999) ("The substantial evidence test . . . involves some deference but also has some bite."). The standard, which is "the same as that traditionally applicable to a review of an administrative agency's findings of fact," Todd, 244 F.3d at 58, "does not mean a large or considerable amount of evidence," or even a preponderance of the evidence, just "more than a scintilla of evidence." ATC Realty, 303 F.3d at 94–95 (quotation marks omitted). Indeed, substantial evidence is simply

> such relevant evidence as a reasonable mind might
> accept as adequate to support a conclusion. The
> reviewing court must take into account contradictory
> evidence in the record. But the possibility of drawing
> two inconsistent conclusions from the evidence does not
> prevent an administrative agency's finding from being
> supported by substantial evidence.

11

<u>Todd</u>, 244 F.3d at 58 (quoting <u>Penobscot Air Servs., Ltd. v. FAA</u>, 164 F.3d 713, 718 (1st Cir. 1999)).

The substantial evidence standard does not allow a court to "uphold a board's denial of a permit on grounds that it did not present in its written decision." <u>Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals</u>, 297 F.3d 14, 22 (1st Cir. 2002).  It does not follow, however, that judicial review of a board's decision is limited "only to the facts specifically offered in the written decision." <u>Todd</u>, 244 F.3d at 60.  So a reviewing court can rely on evidence from the written record supporting the board's stated reasons for its decision, even if the board itself did not.  <u>See id.</u>; <u>see also</u> <u>Second Generation Props., L.P. v. Town of Pelham</u>, 313 F.3d 620, 627 (1st Cir. 2002) ("an instance in which the district court reviewed the record developed by the Board and provided more detail than did the Board in its decision . . . is entirely in accordance with the [TCA]").


III. **<u>Analysis</u>**

Industrial argues that the reasons given by the planning board in its written decision denying a conditional use permit for the proposed tower are unsupported by substantial evidence in the record.  As just noted, the planning board found that Industrial violated § VI(b)(1) of the Town's Personal Wireless

12

Ordinance, requiring that, "[i]f feasible, personal wireless service facilities shall be located on existing structures," because Industrial "failed to explore a new tower with multiple collocations at the State Police Barracks."[5]

As an initial matter, the court rejects the premise of Industrial's principal challenge to the decision:  that an alternative to a proposed wireless facility can never be "feasible" unless it provides coverage that fills the same gap or, as Industrial put it bluntly at oral argument, that providers "have a right to fill the gap they choose."[6]  That is not the law.  "Under the TCA, local governments retain control 'over decisions regarding the placement, construction, and modification

---

[5]Despite the reference in this passage to a "new" tower at the state police barracks, the parties have taken the board's decision in this respect to rely on Industrial's alleged failure to use the <u>existing</u> tower there, either on its own or in conjunction with another, shorter tower elsewhere in the Town. The court will do the same.

[6]When pressed by the court, Industrial backed off this position somewhat, arguing that, at the least, it was entitled to a location from which coverage would "substantially" close the gap.  As discussed <u>infra</u>, while the degree to which coverage from an alternative site closes a gap certainly bears on whether that site is "feasible," neither that standard under the Ordinance nor the substantial evidence test under the TCA entitles the provider to any particular degree of overlap.  <u>Cf.</u> <u>Town of Amherst</u>, 173 F.3d at 15 (declining to "decide now whether and to what extent legitimate zoning requirements could require a carrier to accept a wireless system that is functional but offers less than perfect performance" despite the TCA's effective prohibition rule).

of personal wireless services.'"   <u>Todd</u>, 244 F.3d at 57 (quoting

47 U.S.C. § 332(c)(7)(A)).   Accordingly, "developers of wireless

networks are not entitled to locate facilities wherever they wish

to, nor are local governments required to approve the 'best' or

most economical siting proposals, so long as permit denials are

given in writing and are supported by substantial evidence in the

record."  <u>ATC Realty, LLC v. Town of Sutton</u>, 2002 DNH 057, 30

(citing <u>Town of Amherst</u>, 173 F.3d at 14–15).

Industrial is wrong, then, that the TCA prohibits a town

from rejecting a proposed wireless facility based on potential

alternative sites offering lesser impacts unless those sites

close the same coverage gap as the site proposed.  <u>See</u> <u>Todd</u>, 244

F.3d at 63.  Rather, "[f]or a telecommunications provider to

argue that a permit denial is impermissible because there are no

alternative sites, it must develop a record demonstrating . . .

that the alternatives are not <u>feasible</u> to serve its customers."

<u>Id.</u> (emphasis added).  The term "feasible"––which, not

coincidentally, is the same term that appears in § VI(b)(1) of

the Ordinance here––means simply "capable of being done, executed

or effected:  possible of realization."  <u>Webster's Third New</u>

<u>International Dictionary</u> 831 (2002).

So a facility at an alternative site can be "feasible to

serve [a provider's] customers" even if it does not close an

identified coverage gap all, or even most of, the way that a
facility at the provider's proposed site would.  Cf. Nextel
Commc'ns of Mid-Atl., Inc. v. City of Cambridge, 246 F. Supp. 2d
118, 125 (D. Mass. 2003) (observing that a decision "might have
been on shakier ground" if the proposed site "genuinely was [the
provider's] only option, and that the proposal was necessary to
close a 'significant' coverage gap").  Linguistic niceties aside,
a contrary rule would effectively strip local authorities of
their "wide latitude in deciding questions related to the siting
of telecommunication facilities."  ATC Realty, 2002 DNH 057, at
26 (citing Town of Amherst, 173 F.3d at 15); see also 47 U.S.C. §
332(c)(7)(A).  Instead, municipalities would be wholly precluded
from considering alternatives that, while offering reduced
impacts vis-a-vis the provider's proposed location, did so only
at the cost of leaving a larger gap in coverage.  In contrast, as
the court of appeals has instructed, these sorts of cost-benefit
analyses "are in the realm of trade-offs . . . subject to an
outer limit, such choices are just what Congress has reserved to
the town."  Town of Amherst, 173 F.3d at 15.

     The board's decision thus did not transgress the TCA's
"outer limit" simply because it relied on the feasibility of an
alternative location unable to offer precisely the same coverage
as the 103 High Road site.  There is no dispute that locating a

15

facility on the state police tower would leave a portion of the
gap in question without coverage, but that portion would extend
only about one and one-half miles along Route 125 through its
intersection with Route 155 and northward to the Lee line--at
least insofar as that portion lies along major roads within the
Town of Epping.  A larger part of the gap would remain across the
Epping town line, in Lee, but, as the Town points out, "[n]othing
in the . . . [O]rdinance or in the TCA requires the local zoning
authority to permit the construction of a facility within its
community in order to service neighboring jurisdictions."[7] USCOC
of N.H. RSA No. 2 v. Town of Hopkinton, 137 F. Supp. 2d 9, 17-18
(D.N.H. 2001) (citing cases).[8]

---

[7]In its reply, Industrial complains that "the Planning
Board's decision did not take into account the coverage flowing
into neighboring towns, and therefore, its is not a valid basis
for upholding the Board's decision on this appeal" (footnote
omitted).  The premise of that argument is flawed, as explained
infra at 26.

[8]At oral argument, Industrial characterized the Town's
suggestion that it should not have to host wireless facilities
which serve other towns as "chutzpah," particularly in light of a
provision in the Ordinance requiring, "where technically
feasible, co-location and minimal siting options through an
assessment of . . . siting possibilities beyond the political
jurisdiction of the Town."  The court of appeals has recognized,
however, that "it may be possible to provide an adequate level of
personal wireless services to a particular community solely
through facilities located outside that community," rejecting the
argument "that this result would allow [a town] to displace onto
other jurisdictions the obligation to host new cell towers" as
"contrary to the TCA's emphasis on protecting the interests of

Moreover, unlike the coverage from Industrial's proposed site, coverage from the state police tower would extend through Epping's commercial center, including the major intersection of Routes 125 and 27.  The board, as just discussed, was entitled to weigh this advantage of siting the new facility on the existing police tower against the corresponding disadvantage, i.e., leaving a coverage gap in part of northern Epping, chiefly along the last one and one-half mile stretch of Route 125.

As the board recognized, another such advantage is minimizing the aesthetic impact of a new wireless facility by locating it on an existing structure, and in the wireless overlay district.  "[L]imitations upon local authority in the TCA do not state or imply that the TCA prevents municipalities from exercising their traditional prerogative to restrict and control development based upon aesthetic considerations."  Todd, 244 F.3d at 61.  Here, in addition to these "traditional prerogatives," the Ordinance's stated "goals and standards" include "[r]educ[ing] adverse impacts [personal wireless service

_____

consumers and residents rather than those of carriers and developers."  Second Generation Props., 313 F.3d at 632.  While the court warned that it "would view very differently a case in which a town attempted to deflect onto another jurisdiction the need to build new towers necessary to provide services to meet the TCA's goals where no service has been provided," id. at n.12, that is not this case; the board's decision relied on the feasibility of alternative sites in Epping, not elsewhere.

facilities] may create, including . . . impacts on aesthetics"
and "[r]equiring, where technically feasible, . . . minimal
impact siting options."

Substantial evidence supports the board's decision that,
when these benefits are weighed against the detriment of a larger
remaining coverage gap in the northern part of the Town, siting a
new facility on the state police tower is a feasible alternative
to siting it at 103 High Road.  As one court has observed,

> A reasonable decision whether to approve the
> construction of an antenna for cellphone communications
> requires balancing two considerations.  The first is
> the contribution that the antenna will make to the
> availability of cellphone service.  The second is the
> aesthetic or other harm the antenna will cause.

PrimeCo Personal Commc'ns, Ltd. P'ship v. City of Mequon, 352
F.3d 1147, 1149 (7th Cir. 2003) (Posner, J.).  Viewed in this
light, the board's decision was "reasonable," i.e., within the
"outer limit" of the substantial evidence standard.

In any event, even if Industrial were correct that an
alternative site for a wireless facility cannot be "feasible"
unless it fills the same gap as the proposed site, there was
substantial evidence that using the existing police tower in
conjunction with a new––but shorter––tower at the 103 High Road
site would satisfy that standard.  There is no dispute that, as
Maxson concluded, "the combination of the State Police Tower, the

18

existing American Tower facility and a hypothetical 80-foot pole in the north of Epping would provide significantly better coverage in Epping than the proposed tower."[9]

Industrial nevertheless argues that Maxson's conclusion does not amount to substantial evidence.  First, Industrial dismisses it as "surmise[]" or "conjecture," but Maxson supported his statement with a propagation map showing the composite coverage from all three facilities.[10]  Though Industrial, in its reply

---

[9]In light of this evidence, Industrial's reliance on USCOC of N.H. RSA #2 v. City of Franklin, 2005 DNH 172, is unavailing. There, the local zoning board rejected a proposed tower because, in addition to concerns over reduced property values, see infra note 14, the applicant failed to show the inadequacy of alternative sites.  2005 DNH 172, 18-19.  Because the only evidence on this point were the applicant's own propagation studies showing that towers at those sites would not close the identified coverage gap, however, this court ruled that the board's decision was not supported by substantial evidence.  Id. at 23.  Here, in contrast, Maxson's propagation study demonstrated that the combined coverage from his proposal would exceed that from Industrial's proposal, at least in Epping.

[10]The court recognizes that, in Maxson's propagation study, the "hypothetical 80-foot pole in the north of Epping" was not located at the 103 High Road site, but at another parcel nearby, and that, in its response to Maxson's report, Industrial recited difficulties in using that parcel, including the presence of wetlands and the availability of access (at least to the point on the parcel used for Maxson's propagation study) only by crossing adjacent land owned by Burley.  Nowhere in Industrial's motion papers, however, does it argue that this information undermines the board's finding that a shorter tower at the nearby 103 High Road site would, in combination with the state police tower, present a feasible alternative to Industrial's proposed 150-foot pole.  Such an argument is hard to imagine, given the close proximity of Industrial's proposed site and Maxson's hypothetical

brief, complains that "Maxson is not a radio frequency engineer,"
his report to the board states that his propagation analysis is
"based on the Longley-Rice model published by the United States
[G]overnment Institute for Telecommunications Science as the
Irregular Terrain Model" (parentheticals omitted) as well as that
his business had assisted more than one hundred municipalities
"in all manner of wireless siting activities" over the past
twenty years.  Given this foundation, the board could have
properly treated Maxson's conclusion as to the coverage from the
combined facilities as part of the substantial evidence
supporting its denial of Industrial's application.[11]  See infra
note 15 and accompanying text.

    Second, Industrial complains that Epping's Personal Wireless
Services Ordinance "does not require, and the Planning Board may
not require, applicants to consider co-location in combination

---

one (to say nothing of the fact that the difficulties at that
parcel cited by Industrial do not appear insurmountable by any
means), but, in any event, the court need not consider it.  See
Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260
(1st Cir. 1999).

    [11]"Especially in administrative adjudication, there is no
magical set of procedures for designating someone as an expert
witness."  Chao v. Gunite Corp., 442 F.3d 550, 559 (7th Cir.
2006).  Maxson's significant experience in the field would seem
to do the trick, even if the rigorous standards of Rule 701 of
the Federal Rules of Evidence applied in proceedings before a
local land use board (which they do not, see infra note __).

with the construction of new facilities." But, as is clear by now, § VI(b)(1) of the Ordinance does require the location of personal wireless facilities on existing structures "[i]f feasible"––a standard that, neither textually nor contextually, excludes siting a facility on an existing structure in conjunction with siting one on a new structure. In any event, there was evidence before the board that combining a facility at the state police tower with an 80–foot pole near the proposed 103 High Road site was not only a feasible alternative to a 150–foot tower there, but a preferable one, at least in some respects.

For one thing, as Maxson pointed out, the combined facilities would provide coverage along Route 125 not only northward through its intersection with Route 155 near the town line, but also southward through Route 125's intersection with Route 27, in the town center––a gap that, again, Industrial's proposal would have left unfilled. For another, while an 80–foot pole at the 103 High Road site would not have completely eliminated the aesthetic impacts of such a structure, it would have lessened them by bringing the tower's height down to a level consistent with that of the surrounding trees. The board found, again, that Industrial's proposal did not "address the option of a lower height of the tower to minimize impacts as detailed in the [O]rdinance." As just discussed, the comparative aesthetic

impacts of the proposed tower and its alternatives was a factor

the board could have legitimately considered, under both the

Ordinance and the TCA, in finding alternatives "feasible."[12]   See

Todd, 244 F.3d at 62 (upholding a decision rejecting a tower "of

a different magnitude than anything else in the vicinity" and

"out of keeping with the residential uses in close proximity").

Furthermore, in addition to demanding minimal aesthetic

impacts generally, the Ordinance's stated "goals and standards"

also specifically "[r]equire the configuration of [a personal

wireless service facility] in a way that minimizes the adverse

---

[12]In its reply brief, Industrial argues that, by virtue of
the height variance from the zoning board, the planning board
"acted without legal authority in requiring Industrial to propose
a cell tower of a lower height."  This court typically disregards
arguments raised for the first time on reply.  See, e.g., Doe v.
Friendfinder Network, Inc., 540 F. Supp. 2d 288, 303 n.16 (D.N.H.
2008).  In any event, the Ordinance explicitly states that "[a]
personal wireless service facility shall require a conditional
use permit in all cases" and, again, one of the standards for
such a permit is the absence of feasible existing structures;
Industrial does not claim to have gotten a variance from that
provision of the Ordinance.
     This court cannot rule, then, that the planning board's
decision is not "consistent with the applicable zoning
requirements" and therefore not supported by substantial
evidence, ATC Realty, 303 F.3d at 94, simply because the board
identified a feasible alternative incorporating a lower tower
than Industrial had been permitted to erect by the zoning board.
The court expresses no view on whether the planning board's
approach was consistent with state land use law, because, as
Burley points out, no such claim is before the court.

visual impact of the facilities and antennas."[13]  One way to
accomplish this, as the board recognized, is to reduce the height
of a proposed new structure while compensating for that
reduction, and the corresponding reach of the structure's
coverage, by also siting on an existing structure elsewhere.
In Town of Amherst, in fact, the court of appeals noted that
substantial evidence likely supported the finding "that a
feasible system could be constructed of [several] very short
towers" rather than the proposed single 190-foot tower, despite
the carrier's views "that even from an aesthetic standpoint, its
solution [was] best" or more "efficient."  173 F.3d at 15.  So,
despite Industrial's protest here, the board had the authority,
under both the Ordinance and the TCA, "to consider co-location in
combination with the construction of new facilities."

Industrial also argues that, regardless of the coverage
attainable from the state police tower, it was still not feasible
because (1) the tower is structurally inadequate and (2) the
state police would not allow a wireless carrier to locate on the

---

[13]In its reply brief, Industrial relies on another of the
Ordinance's stated "goals and standards," i.e., to "[r]equire
cooperation and co-location, to the highest extent possible,
between competitors in order to reduce cumulative negative
impacts upon the Town of Epping."  But this provision does not
prohibit other ways "to reduce cumulative negative impacts," such
as requiring the use of a relatively short new tower in
combination with an existing structure where feasible.

tower.  While Industrial certainly supplied the board with
evidence supporting its position on each of these points, the
board also received evidence to the contrary.

Taking the second point first, Burley provided the board
with information disputing Industrial's view.  Characterizing
this information as mere "discourse on the remarks of a State
Police officer concerning the Department of Safety's relative
receptiveness to negotiation" (bracketing omitted), Industrial
deems it "hardly competent evidence" and therefore not
"'substantial evidence' supporting the Board's decision."

What Burley actually told the board was that "Colonel
Booth[,] head of the [D]ivision of the State Police"––not just
any "State police officer"––responded to her inquiry not only by
telling her that "he would be willing to entertain wireless on
his tower," but also by referring her to "the communications
director who explained an engineering study would have to be done
and offered to help in any way"––not just "relative receptiveness
to negotiation."  So Burley's account provides substantial
evidence for the board's finding "that the Police would be open
to discussing the possibility of collocation" and that their
existing tower was therefore a feasible alternative.[14]

_____

[14]Industrial relies on this court's decision in <u>City of
Franklin</u> for the proposition that, under the TCA, "to be

The board likewise had before it substantial evidence to
find that installing a wireless facility on the state police
tower was feasible despite Industrial's stated concern about the
tower's structural integrity.  Industrial asserted that the state
police tower "will not be adequate structurally to support
additional load capacity of multiple carriers' antenna
equipment," submitting a letter from TCI which opined that "the
tower will not be adequate, structurally, to safely support up to
five (5) wireless carriers."

But there was no evidence before the board that five
carriers were planning on locating on Industrial's proposed
tower; no more than two carriers, in fact, had expressed interest
in doing so.  TCI's opinion, then, did not prevent the board from

---

sustainable . . . fact finding must be based on competent
evidence."  Id. at 17–18.  There, the provider supplied studies
showing that wireless towers do not cause nearby property values
to decline, but the local board rejected them based "on
generalized and unsupported concerns of local residents," id. at
18, rather than "any evidence suggesting that wireless
communications towers cause nearby property values to decline in
general, or that the installation of towers have [*sic*] affected
property values in [the town] differently than in other
communities analyzed in [the provider's] reports," id. at 17.
The board's approach, this court found, did not satisfy the
substantial evidence test.  Id. at 18.  Here, in contrast, the
board received information from Burley specifically contradicting
Industrial's view that the state police would not allow placement
of a private wireless facility on the tower.  That evidence was
"competent" as this court used the term in City of Franklin.

finding that locating those two carriers on the state police tower, instead of the proposed new tower, would be feasible.

Industrial also attacks the Town's reliance on Maxson's telling the board, in effect, that TCI "evaluated the wrong type of tower," because the board "did not make any such finding." Nor, for that matter, did the board make a finding that only two carriers intended to locate on Industrial's proposed tower, but such subsidiary findings are not essential to upholding, under § 332(c)(7)(B)(iii), the board's ultimate finding that the police tower was a feasible alternative.  The TCA requires only "a sufficient explanation of the reasons for the permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons." Todd, 244 F.3d at 60.  It does not demand "a statement of findings and conclusions, and the reasons or basis thereof," id. at 59–60 (quotation marks and ellipses omitted), or prevent the court from locating on its own, or with the assistance of the parties, evidence in the record which supports the stated reasons for the board's denial but was not specifically referenced in its written decision.  Second Generation Props., 313 F.3d at 627.

Industrial also attacks Maxson's statement as "unsubstantiated," because he "provided no evidence of the State Police Tower's height or width" (footnote omitted).  Maxson did,

26

in fact, specifically tell the board that "the police tower is
[a] 160 feet [*sic*] tower nearly three feet across," so
Industrial's argument seems to rely on the unstated proposition
that the TCA's substantial evidence test incorporates a personal
knowledge requirement.  Industrial provides no authority for that
view, which, if accepted, would dramatically transform the local
permitting process from public hearings into formal judicial
proceedings in a manner not contemplated by the TCA.[15]  Cf. Todd,
244 F.3d at 59.  Indeed, it is enough to observe, as Burley
points out, that Maxson's statement is no more devoid of
"evidence" than TCI's letter, which refers to the state police
structure as a "120 foot Guyed Tower" without articulating how

---

[15]In fact, "[i]t has long been settled that technical rules
for the exclusion of evidence applicable in jury trials do not
apply to proceedings before . . . administrative agencies in the
absence of a statutory requirement that such rules are to be
observed." Opp Cotton Mills v. Adm'r, 312 U.S. 126, 155 (1941);
see also, e.g., II Richard J. Pierce, Jr., Administrative Law
Treatise §§ 10.3–10.4, at 711–731 (4th ed. 2002).  As City of
Franklin suggests, see note 14, supra, this is not to say that
rank hearsay, wild speculation, or the like will satisfy the
TCA's standard.  Cf. Nat'l Tower, 297 F.3d at 24 n.4 (observing
that a town "might well have been justified in finding
insufficient an assertion based on information and belief"
because "[s]uch a qualification would make [it] inadmissible, for
example, to support summary judgment in federal court").
Maxson's statement as to the dimensions of the tower, though, is
hardly in that category.

TCI knows that, apart from a reference to "the limited information provided to" Industrial.

In any event, the board received other evidence––in the form of the propagation study of the state police tower submitted by Industrial itself––that the structure measured 150 feet in height, not 120 feet as TCI claimed.[16]  That inconsistency, if not alone than certainly in combination with TCI's unsupported assumption that any tower would have to support five different carriers, provided ample support for the board to disregard Industrial's protest over the state police tower's structural integrity and find that, nevertheless, it was a feasible site.

In sum, substantial evidence supported the board's finding that locating on the state police tower was feasible, either alone or in conjunction with a tower at the 103 High Road site shorter than the 150-foot structure proposed by Industrial.  This is not to say that the board's decision was airtight, or that it could not have reasonably come out in Industrial's favor; but that is not the standard.  "[I]f the issue is simply one of

--------

[16]A footnote in Industrial's reply brief states, "Adding height to the tower does not make it any safer."  This may or may not be true as a matter of structural engineering, but the facts remain that (1) Maxson told the board that the state police tower was not only higher, but also wider than TCI had assumed, and (2) TCI also assumed, contrary to the record, that five different carriers would be placing equipment on the tower.

whether the board's decision is supported by substantial evidence, the courts defer to the decision of the local authority, provided that the local board picks between reasonable inferences from the record before it." <u>Nat'l Tower</u>, 297 F.3d at 22–23.  The board did so here.

But the court of appeals has also cautioned that local zoning requirements which make defending substantial evidence claims under the TCA relatively easy––such as Epping's rule that there be no "feasible" existing alternatives––can also make defending effective prohibition claims under the TCA more difficult.  <u>See</u> <u>Town of Amherst</u>, 173 F.3d at 16–17.  And Industrial's effective prohibition claim remains (though the court expresses no view as to its merits at this point).  So the parties here, like their counterparts there, "might find it prudent to discuss . . . an amicable resolution or an agreed upon procedure to achieve one." <u>Id.</u> at 17.  This court, as always, is willing to offer its services to that end.

In the meantime, however, Industrial shall show cause by September 21, 2009, why summary judgment should not enter against it on its substantial evidence claim, since this court has denied summary judgment for Industrial on its claim to the contrary. "The substantial evidence question would ordinarily be resolved (one way or the other) on the record before the district court

29

and require no trial." Id. at 16.  This appears to be the

ordinary case but, if appearances are deceiving, Industrial can

show how.  Industrial shall not, however, use its response to the

show cause order as an opportunity to reargue anything that was,

or argue anything that could have been, argued in its motion

papers or reply.

**IV.  Conclusion**

For the foregoing reasons, Industrial's motion for summary

judgment on its substantial evidence claim[17] is DENIED.

Industrial shall show cause by September 21, 2009, why summary

judgment should not enter against it on that claim.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

August 11, 2009

cc:  Lawrence M. Edelman, Esq.
     Robert M. Derosier, Esq.
     John J. Ratigan, Esq.
     Jeffrey C. Spear, Esq.

_____

[17]document no. 22.